AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California



FILED
CLERK, U.S. DISTRICT COURT

03/13/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

United States of America,

v.

**CESAR ISAIS,**

Defendant.

Case No.

2 0 MJ 0 1 1 7 0

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 15, 2020, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. § 922(a)(1)(a) | Engaging in the Business Without a License (firearms) |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/
*Complainant's signature*

**JOSE ARELLANO, ATF SA**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3 13 2020

City and state: Los Angeles, California

*Judge's signature*

HONORABLE PATRICK WALSH
*Printed name and title*

AUSA: Kevin J. Butler – x6495

**AFFIDAVIT**

I, Jose Arellano, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against CESAR ISAIS ("ISAIS") for violation of 18 U.S.C. § 922(a)(1)(a): Engaging in the Business Without a License (firearms).

2.    This affidavit is also made in support of an application for a warrant to search 125 East Century Boulevard, Los Angeles, California 90003 (the "SUBJECT PREMISES") as described more fully in Attachment A-1, and the person of ISAIS as described more fully in Attachment A-2.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(a)(1)(a): Engaging in the Business Without a License (firearms), 18 U.S.C. § 922(a)(4): Transporting a Prohibited Weapon Without a License; 21 U.S.C. § 841: (a)(1): Possession with Intent to Distribute a Controlled Substance, and 26 U.S.C. § 5861(c): Making a Firearm in Violation of the National Firearms Act (NFA) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed for four years. As a Special Agent, I received training in federal firearms laws and regulations during the 14-week Special Agent Basic Training at the ATF National Academy in Glynco, Georgia. I regularly refer to these laws and regulations during the course of my duties. I have participated in the execution of many search warrants and arrest warrants related to violations of federal firearms laws. I have conducted numerous undercover operations and have participated in undercover investigations and surveillance of individuals committing crimes of violence and persons in possession of firearms. I have had a close working relationship with the Los Angeles Police Department ("LAPD") and as such have participated in the execution of arrest warrants and the investigation of crimes involving firearms and narcotics. I am currently assigned to the ATF Los Angeles Group II. Field Office. I am also a Captain in the U.S. Army Reserves where I serve as a Special Agent with U.S. Army Counterintelligence and have deployed to Afghanistan in support

of a Special Operations Joint Task Force during Operation Enduring Freedom.

### III.  SUMMARY OF PROBABLE CAUSE

6.    Between January 15, 2020 and February 11, 2020, The ATF conducted four controlled purchases/operations in which ISAIS sold a total of five firearms to an ATF Confidential Informant (the "CI") and one firearm and 354 gross grams of methamphetamine to an Undercover ("UC") ATF Agent.  Throughout these purchases, ISAIS also claimed to have for sale working grenade launchers and provided pictures of the same.

7.    During one of these purchases, ISAIS was seen driving a 2004, Gold GMC Envoy bearing California license plate 8KZA632. A California Department of Motor Vehicles (DMV) query revealed that this vehicle was connected to the SUBJECT PREMISES -- which is also the location in which the majority of controlled purchases took place and where law enforcement agents witnessed ISAIS coming and going.

### IV. STATEMENT OF PROBABLE CAUSE

8.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

#### A.    Background

9.    On January 9, 2020, an ATF CI[1] met with ATF Special Agent ("SA") Jose Arellano and ATF-Task Force Officer ("TFO") John Hackman, where the CI provided information regarding ISAIS.

---

[1] The CI is working for cooperation credit and has criminal convictions for at least: accessory after the fact.

3.

The CI told SA Arellano that ISAIS was the gun source for several "AR" type Short Barreled Rifles ("SBR") and Glock pistols that were previously sold to an Undercover ATF Agent. The CI told SA Arellano and TFO Hackman that ISAIS had sent him/her a video of a grenade launcher he had for sale for approximately $2,800.  SA Arellano and TFO Hackman directed the CI to set up a controlled purchase for the grenade launcher and two AR-type SBRs on Wednesday, January 15, 2020.

### a.   Sale of two SBR rifles on January 15, 2020

10.   On January 13, 2020, the CI advised SA Arellano that he had secured the sale of the grenade launcher and two AR-type SBRs for $5,000 on January 15, 2020, and provided pictures and videos of the aforementioned firearms.  SA Arellano instructed the CI to contact ISAIS and ask if he/she could borrow the grenade launcher for 30 minutes to an hour, under the guise that his/her buyer wanted to make sure the grenade launcher was real before purchasing it.

11.   On January 14, 2020, the CI placed a call to ISAIS and told him that he/she would meet up with ISAIS around 1:00 PM (on January 15, 2020) to purchase the firearms and ISAIS agreed.  As instructed, the CI asked ISAIS if he/she could borrow the grenade launcher for 30 minutes and ISAIS agreed.

12.   On January 15, 2020, at approximately 12:00 PM, SA Arellano briefed ATF agents and LAPD Officers at a predetermined meet location.  In the event that explosive ordinances were to be present, SA Arellano had ATF Bomb Technician SA Ioannis Douroupis on scene in order to secure/render safe any unexploded

ordinance.  The bomb technician would also be present in order
to make a determination as to whether or not the grenade
launcher was real.

13.  At Approximately 1:00 PM, the CI drove to the SUBJECT
PREMISES (ISAIS's residence) and met with ISAIS.

14.  Shortly thereafter, the CI was greeted by ISAIS.  The
CI walked with ISAIS (who was carrying the two AR type-SBRs, and
the grenade launcher) back to the CI's vehicle.  The CI paid
ISAIS $2,200 for the two SBR rifles and told ISAIS that he/she
would return with grenade launcher or money later.  ISAIS agreed
and told the CI that if his/her buyer wanted the grenade
launcher, to let him know so they could meet up afterwards and
complete the deal.

15.  Upon arriving at the predetermined meet location, the
CI gave SA Arellano the two AR-type SBRs which did not bear any
serial numbers, model numbers or indicia of the manufacturer of
the guns, two high capacity 30 round magazines for the SBRs, and
the suspected grenade launcher.

16.  While at the predetermined meet location, SA Douroupis
examined the suspected grenade launcher and determined that it
was actually a plastic replica of a grenade launcher used to
shoot plastic projectiles known as "Airsoft Guns."

17.  At approximately 1:20 PM, the CI was directed to place
a call to ISAIS and tell him that his/her buyer did not want to
buy the grenade launcher but if he had any other firearms
available for sale he/she would buy them.  ISAIS told the CI to

come back to his home so they could talk about it. The CI agreed and then ended the phone call.

18. At Approximately 1:30 PM, the CI arrived at the target location and placed a call to ISAIS to let him know he/she was outside. ISAIS came out to greet the CI. The CI told ISAIS that his/her buyer did not want the launcher because it was plastic. The CI further explained that his/her buyer had a grenade launcher before and that it was all metal and had a spiraled (or rifled) barrel. The CI told ISAIS that if he had any metal ones, his/her buyer would purchase it. ISAIS told the CI that he had already sold all the firearms he had but that he was working on ARs that could shoot AK-47 rounds (7.62 caliber ammunition). The CI told ISAIS that if he had anything available for the following week that he/she would buy it. The CI asked ISAIS if he could still get automatics (referring to Glock pistols modified to shoot like an automatic weapon) and ISAIS told the CI that he could get two of them by Friday (February 17, 2020). The CI told ISAIS to let him/her know when he had them available for sale. ISAIS showed the CI pictures he had on his cellphone of other grenade launchers. The CI told ISAIS that they looked good and that his/her buyer likes buying military style weapons. ISAIS told the CI that the launchers in the pictures were also military grade. The CI asked ISAIS if the grenade launchers on his phone were made of metal. ISAIS told the CI that they were made of fiberglass because the metal ones were too heavy to carry around. ISAIS asked the CI if he/she wanted an AR that could shoot 7.62 rounds. The CI told

ISAIS he/she wanted three firearms like an AR, an automatic (Glock or AR) and whatever else he had available.  The CI thanked ISAIS, engaged in small talk and then went back to his/her vehicle

**b.   Sale of Two Glock Automatics on January 22, 2020**

19.   On January 19, 2020, the CI contacted SA Arellano to inform him that ISAIS had two Glock automatics (referring an auto sear attached to the rear of the upper slide that allows the handgun to shoot like a machine gun), two 33-round magazines and one AR-47 (referring to an AR type rifle that can shoot a 7.62 round -- like an AK-47) for $5,000.  SA Arellano told the CI to try to have the price lowered because the price for the auto-Glock was too high.  The CI agreed and told SA Arellano that he/she would try to have the price lowered.

20.   On January 21, 2020, the CI advised SA Arellano that he/she had secured the sale of the two (2) auto-Glock pistols and one (1) AR type SBR for $4,500 for January 22, 2020, at 10:00 AM and provided a picture of the aforementioned firearms that ISAIS had sent him via text message.

21.   On January 22, 2020, at approximately 9:00 AM, SA Arellano briefed ATF agents and LAPD officers at a predetermined meet location.

22.   At approximately 11:50 AM, the CI was driven in an undercover vehicle posing as an Uber and dropped off in the area of the SUBJECT PREMISES.

23.   At approximately 11:53 AM, the CI arrived at the target location and was greeted by ISAIS.  The CI asked ISAIS

why he was wearing gloves and ISAIS told him/her that he was building the AR (referring to an AR Rifle). The CI then followed ISAIS into his residence. The CI told him that he/she was in a hurry and told ISAIS that he/she thought the firearms were ready to go. ISAIS said they were ready and handed the CI the two auto-Glock pistols and a tube of glue. The CI asked ISAIS if they were automatic and ISAIS said yes. ISAIS told the CI that he puts glue on the auto switch to keep it in place (referring to preventing the auto-switch/button from slipping back into semi-automatic mode; commonly, the vibrations from firing a Glock in automatic mode can cause the switch/button to slip into semi-automatic mode). ISAIS asked CI where he/she was going so he could bring the CI the AR when it was completed. The CI told him that he/she would just give him the money for the two Glock pistols. The CI asked him why the AR was not ready and ISAIS told him/her it was because he had lost a little button (part) that went on the AR. The CI began to count out the $3,500 and handed it to ISAIS. ISAIS began to count the money then handed the CI two high capacity magazines for the Glock pistols. The CI apologized that he/she could not wait around for the AR but he/she was in a hurry. ISAIS told the CI that he would let him/her know when it was completed. The CI told ISAIS he/she would let him know when he/she needed more stuff (referring to firearms). ISAIS walked out with the CI and told him/her that he would be in Arizona. The CI asked him if he could still get a grenade launcher and ISAIS told him/her that that would be easy then said good bye.

24.  After the sale, the CI gave SA Arellano the two Glock-
type handguns which did not bear any serial numbers, model
numbers or indicia of the manufacturer of the guns.  The Glock-
type handguns both had Glock switches (auto-sears) attached to
the upper slide which allow them to shoot like machine guns.

**c. Sale of One .50 caliber rifle on January 30, 2020**

25.  On January 27, 2020, at approximately 4:10 PM, the CI
contacted SA Arellano via text message to inform him that ISAIS
wanted to sell him/her a .50 caliber rifle for $7,000.  The CI
also forwarded a picture he/she had received from ISAIS via text
to SA Arellano of what appeared to be a Beretta .50 caliber
rifle (frequently used by the military and capable of shooting
through engine blocks and cinder block walls).  The CI forwarded
text messages regarding narcotics and pictures of what appeared
to be two Glock pistols with high capacity drum magazines
attached to them and an AR type rifle.  The CI told SA Arellano
that ISAIS was also selling the three firearms for $2,500.

26.  On January 29, 2020, SA Arellano was contacted by the
CI via text message and then, after several negotiations, he/she
had managed to lower the price if the .50 caliber rifle to
$6,000, but that it had to be purchased as soon as possible or
ISAIS was going to sell it to another person for $7,500.  In the
interest of public safety, SA Arellano directed the CI to set up
the purchase of the .50 caliber rifle for $6,000 on January 30,
2020, at 1:00 PM in order to keep the rifle off the streets.

27. On January 30, 2020, at approximately 12:00 PM, SA Arellano briefed ATF agents and LAPD officers at a predetermined meet location.

28. At approximately 1:35 PM, the CI drove to the SUBJECT PREMISES.

29. At approximately 2:03 PM, the CI arrived at the SUBJECT PREMISES and placed a call to ISAIS to let him know that he/she was outside his residence. Shortly thereafter, the CI was greeted by ISAIS. The CI then followed ISAIS into his residence where they engaged in casual conversation regarding firearms. Upon entering ISAIS's residence the CI asked to see the .50 caliber rifle. The CI complimented ISAIS on the rifle and the scope that came with it. ISAIS told the CI that the price of the scope alone was $500. The CI told ISAIS that his buyer was happy with the firearms he had been buying so far. The CI then proceeded to count of the $6,000 in government funds to ISAIS. ISAIS and the CI continued to engage in casual conversation regarding firearms. ISAIS told the CI he was going to buy "shells," referring to projectiles for a grenade launcher he had previously tried to sell to the CI. The CI told ISAIS to let him/her know whenever he had "fast ones" because his buyers really liked those. ISAIS asked what fast ones meant and the CI told him "Rapid Fire." ISAIS acknowledged that he/she was referring to automatic firearms. ISAIS told the CI that he had a firearms source who was ex-military that could make .50 caliber rounds that could pierce through walls or could pierce walls first, and then detonate after penetration. The CI asked

ISAIS if ammunition had to be provided before being modified and ISAIS said no, that his source provided everything. ISAIS told the CI that those bullets were more expensive but that he would try to get a sample first. The CI told ISAIS to let him/her know how much the modified ammunition would cost and ISAIS agreed.

30. After the sale, the CI gave SA Arellano one, Make: Barrett; Model: 99; Caliber .50 Cal rifle, serial number 3454, and ten rounds of .50 caliber ammunition.

### d. **Sale of One Russian-type light machine gun and 354 grams of suspected methamphetamine to a UC ATF Agent on February 11, 2020**

31. On February 7, 2020, the CI met with SA Arellano and TFO Hackman and told them that ISAIS had a Russian machine gun for sale. The CI showed SA Arellano and TFO Hackman text messages from ISAIS that discussed prices for the machine gun and pictures of what appeared to be a Russian type machine gun and round belt-fed, drum-type magazines. SA Arellano and TFO Hackman asked the CI if ISAIS sold narcotics and the CI said yes. SA Arellano and TFO Hackman asked the CI if he/she could introduce a UC to ISAIS and the CI said yes. SA Arellano and TFO Hackman directed the CI to set up a buy for the Russian machine gun and a pound of methamphetamine for February 11, 2020 and to arrange an introduction between ISAIS and a UC.

32. On February 9, 2020, the CI told SA Arellano that he/she had negotiated the price down to $6,000 for the machine gun and $2,000 for the pound of methamphetamine. SA Arellano

11

directed the CI to set up the purchase of the Russian machine gun and the one pound of methamphetamine for $8,000 on February 11, 2020 at 1:00 PM at the Home Depot parking lot located at 101 Towne Center Drive, Compton, California 90220.

33.  On February 11, 2020, at approximately 12:00 PM, SA Arellano briefed ATF agents and LAPD officers at a predetermined meet location.

34.  At approximately 2:55 PM, the UC and the CI arrived at the target location and waited for ISAIS to arrive.  During this time, the CI called/texted ISAIS and asked for his estimated time of arrival and ISAIS told the CI he would arrive shortly.

35.  At approximately 3:27 PM, ISAIS arrived in a gold colored GMC Envoy, bearing California license plate 8KZA632 (registered to ISAIS).  ISAIS greeted the UC then walked to the rear of his vehicle and opened the rear hatch of his SUV. Inside the trunk of the car, the UC observed a black plastic rifle case next to other firearm parts and accessories.  The UC opened the case and saw a Russian-type machine gun inside the rifle case.  The UC complimented ISAIS on the machine gun.  The UC asked ISAIS if the drum type magazines were "Old School" (vernacular for vintage), because the carry cases for the belt fed drum/magazines were in a vintage looking green burlap bag. The UC told ISAIS that the green burlap bag for the firearm had the year 1960 stenciled on it.  The UC then opened the rear door of his/her UC vehicle and placed the firearm inside.  ISAIS then walked to the passenger side of his vehicle, reached into his vehicle and handed over a white plastic bag containing the pound

of methamphetamine.  The CI asked ISAIS if that was the "whole"
(referring to a whole pound of methamphetamine) and ISAIS shook
his head up and down to say yes.  The UC told ISAIS that he/she
was also engaged in firearms and narcotics trafficking and if
ISAIS wanted, they could exchange phone numbers to continue
doing business together.  ISAIS pointed to the CI and said that
he would prefer to go through him/her.  The UC told him that
however he wanted to work it out, to let him/her know.  The UC
further stated that if he had another source that he/she could
work with to let him/her know as well.  ISAIS agreed and then
told the UC that he had a grenade launcher for sale.  ISAIS told
the UC that the grenade launcher was a 40-millimeter (referring
to the size of the projectile it launched).  The UC asked ISAIS
if he had a picture of it.  ISAIS took out his cellphone and
began to scroll through his photos.  ISAIS did not show the UC
any photographs from his phone but instead told the UC that he
was trying to get a round for it (referring to a grenade
projectile).  The UC told ISAIS that he had a source that made
"Ghost Guns" (referring to privately made firearms) but that the
UC was always looking for a source with lower prices.  ISAIS
asked the UC how much he/she paid for ARs (referring to AR-15
assault rifles).  The UC told him it depended on the quality of
the components.  The UC told ISAIS he/she could get an automatic
AR for $1,100 and that his/her source also made Glock handguns.
ISAIS told the UC that prices on the Glock pistols could range
from $600 or $700 to $1,500.  The UC told ISAIS that he had his
money for the firearm/narcotics, and then walked to the

13

passenger side of ISAIS's vehicle in order to count out the $8,000 in a more discreet manner.

36.   After the sale, SA Arellano took into custody one DSA, Inc., 7.62 caliber rifle, bearing serial number 012857, and 354 grams of suspected methamphetamine.

### B.   Criminal History

37.   On or around January 9, 2020, criminal history search for ISAIS revealed that he had no prior convictions and was not a convicted felon.

### C.   Interstate Nexus

38.   On February 25, 2020, an ATF Interstate Nexus Expert gave a verbal confirmation that the Barrett Model: 99 .50 caliber rifle, serial number 3454, was manufactured outside the State of California.  He opined that, because the rifle was recovered in California, it must have traveled in and affected interstate commerce.

39.   On February 25, 2020, an ATF Interstate Nexus Expert gave a verbal confirmation DSA, Inc., Model: RPD; 7.62 caliber rifle, serial number 012857, was manufactured outside of the State of California.  He opined that, because the rifle was recovered in California, it must have traveled in and affected interstate commerce.

### D.   Investigation of the SUBJECT PREMISES

40.   Based on a search of records from the California Department of Motor Vehicles, I learned that ISAIS reported the SUBJECT PREMISES as his residence as January 9. 2020.

41.  Based on my search of state and federal law enforcement databases, I learned that ISAIS was also listed as a resident of the SUBJECT PREMISES.

42.  Surveillance conducted by ATF agents and LAPD officers observed ISAIS coming and going from the SUBJECT PREMISES before and after the firearms purchases.

## V.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

43.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.  Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.    Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

44.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

---

as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

17

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

45.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult

to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

46.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

2. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ISAIS's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of ISAIS's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

3. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

47. For all of the reasons described above, there is probable cause to believe that ISAIS has committed a violation of Title 18, United States Code, Section 922(a)(1)(a): Engaging in the Business Without a License (firearms). There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachment A-1 and the person of ISAIS described in Attachment A-2.

Jose L. Arellano
Special Agent,
Bureau of Alcohol, Tobacco,
Firearms and Explosives


Subscribed to and sworn before me
this __ day of March, 2020.

UNITED STATES MAGISTRATE JUDGE

HON.  PATRICK J. WALSH

21